IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,          )
                                   )
    Plaintiff,                     )          Criminal Action No.
                                   )          1:08-CR-00187-CAP-LTW
v.                                 )
                                   )
JOSEPH MANN PROPST,                )
                                   )
    Defendant.                     )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND ORDER CERTIFYING DEFENDANT READY FOR TRIAL

    This case is before the Court on Defendant Joseph Mann Propst's Motions to Suppress Illegally Seized Evidence and to Suppress Statements, as well as his Perfected Motion to Suppress Evidence.[1] Docket Entries [11, 14, 26]. The Government filed a response in opposition to Defendant's motions. Docket Entry [53].

    For the reasons outlined below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Illegally Seized Evidence, Motion to Suppress Statements, and Perfected Motion to Suppress Evidence be **DENIED**. Docket Entries [11, 14, 26]. Defendant's Unopposed Motion for Extension of Time in which to File Responsive Brief

---

[1]The undersigned deferred Defendant's pending Motion to Allow Participation in Voir Dire (Docket Entry [13]) to the District Judge on June 9, 2008. Docket Entry [19].

is **GRANTED NUNC PRO TUNC** to November 4, 2008.  Docket Entry [55].

## BACKGROUND

### A.    The March 9, 2006 Search

In late morning on March 9, 2006, Atlanta Police Department ("APD") Officer K.R. Buchanan responded to a 911 call reporting an incident near Peachtree Hill Avenue and Virginia Place in Atlanta, Georgia.  (Transcript of Continuation of Motion to Suppress Proceedings ("Tr.2") August 12, 2008, at 30-31).  Officer Buchanan arrived at the scene within minutes, and was immediately approached by Defendant, who indicated that he had been shot.  (Tr.2 at 31).  Officer Buchanan observed blood on Defendant's left hand and shirt, and thus treated Defendant as a victim.  (Tr.2 at 32).  In particular, Officer Buchanan confirmed Defendant's injury, called for back-up, and requested that an ambulance be sent to attend to Defendant.  (Tr.2 at 32-33).  Senior Officer Carl Goode arrived on the scene shortly after Officer Buchanan.  (Tr.2 at 81-82).

Defendant identified himself to the officers and stated that an African-American male known as "Memphis" had fired shots at him while riding in the passenger seat of a tan Toyota.  (Tr.2 at 33, 36, 47-48, 84, 87).  Defendant explained that he then retrieved a gun from his nearby apartment and in self-defense, returned fire at Memphis.  (Tr.2 at 33, 36).  Although Defendant was not searched, officers did not perceive any weapon on

AO 72A
(Rev.8/82)

his person. (Tr.2 at 36, 83). Defendant also advised the officers that his brother, who was armed with a gun, drove off after Memphis' vehicle in a silver BMW. (Tr.2 at 84, 87). Officer Goode testified that after Defendant's brother returned to the scene, he observed a .45 caliber pistol inside the silver BMW.[2] (Tr.2 at 84-85). When Defendant offered these statements to the officers, he was not considered a suspect, handcuffed, or under arrest. (Tr.2 at 36-37, 48). Defendant was transported to the hospital for treatment some time before 12:30 p.m., (see APD Supplementary Incident Report, Docket Entry [56-3]), and was ultimately taken into custody while at the hospital. (Tr.2 at 49).

Also on March 9, 2006, APD Investigator B. Anderson applied for a search warrant for 2268 Virginia Place #F, N.E., Atlanta, Georgia. (Affidavit and Order for Search and Seizure, Docket Entry [56-4]). In support, Officer Anderson presented the following facts:

> On 03-09-06 at approximately 11:21 am the Atlanta Police were dispatched to the area of 2268 Virginia Pl. on shots fired. Subsequently this Affiant responded and talked to Joseph Propst who stated after being shot at and getting shot in the left hand retrieved a weapon from 2268 Virginia Pl. #F and fired the weapon several times at suspects that had shot him. This Affiant observed blood from outside 2268 Virginia Pl. leading to the door of

_____

[2]Officer Goode estimated that this observation occurred at approximately 11:50 a.m., some ten minutes after he (Officer Goode) arrived at the scene. (Tr.2 at 82, 84). According to Officer Goode, Defendant's brother maintained that the gun found in the BMW was the weapon Defendant had fired. (Tr.2 at 85).

AO 72A
(Rev.8/82)

2268 Virginia Pl. #F. Based on this Affiants [sic] observations and statement
of Propst this Affiant Request [sic] a search warrant for 2268 Virginia Pl. #F
N.E. Atlanta, Ga.

(Id.). Officer Anderson further attested that the search warrant was necessary to recover

tangible evidence of the commission of "reckless conduct" and "discharge of firearm

near highway," specifically, "handguns, rifles, shell casings, blood, and ammunition."

(Id.). A Fulton County State Court judge signed the search warrant at 2:08 p.m., (see

id.), and officers executed the warrant later that day. (Tr. at 80-81). The following

evidence was recovered in the search: one (1) Rossi .357 handgun, seventeen (17) .357

caliber rounds, one (1) small green plastic bag of suspected heroin, clear plastic bags of

various sizes, two (2) photographs, and six (6) marijuana cigarettes. (Return, Docket

Entry [53-2]; Tr.2 at 80).

**B.**      **The October 19, 2007 Arrest, Searches, and Statements**

On October 19, 2007, a bail bondsman entered Defendant's apartment at 2025

Peachtree Road, Atlanta, Georgia to make a fugitive recovery. (APD Offense Report,

Docket Entry [56-5]). The bondsman, who was employed by 24/7 Easy Term Bonds,

detained Defendant and two other individuals in the Peachtree Road apartment. (Id.).

The bondsman noticed several handguns and a large amount of suspected heroin inside

the Peachtree Road apartment, the majority of which he moved from the bedroom to the

4

dining table.  (Id.; see also Report of Investigation, Docket Entry [56-6]).  The bondsman then contacted the APD and recounted the foregoing details.  (APD Offense Report, Docket Entry [56-5]; Report of Investigation, Docket Entry [56-6]).  APD officers arrived at the Peachtree Road apartment sometime thereafter.  (APD Offense Report, Docket Entry [56-5]; Report of Investigation, Docket Entry [56-6]).

Defendant refused to consent to APD officers' search of the Peachtree Road apartment.  (APD Offense Report, Docket Entry [56-5]).  As such, APD Officer M. Baker applied for and obtained a search warrant for the apartment later that day.  (Affidavit and Application for a Search Warrant, Docket Entry [56-7]).  In support, Officer Baker averred, in relevant part, as follows:

> I responded to location for a call about drugs and guns from a bail bondsman Ken Barr who works for 24/7 Easy Term Bond 404-915-4325.  Mr. Barr informed me that he went to listed location to make an apprehension on fugitive Joseph Propst.  While inside the apartment bondsman Barr observed the listed weapons and what he believed to be heroin based on his past experience.  Bondsman Barr stated all the drugs and guns were in plain view.  Mr. Propst was advised of his Miranda warnings and he replied "yes" that he would speak with police about incident without a lawyer in my presence.  Mr. Propst stated that the guns were his but the drugs were not and he did not know if there were any other drugs in the apartment.

(Id.).  Officers executed the search warrant on October 19, 2007, recovering various quantities of drugs and guns, among other items.  (Tr.2 at 88-90).

5

Also on October 19, 2007, APD Officer Maurice Phelps, a trained narcotics canine handler, and his dog Bolo were called to inspect Defendant's silver Mercedes CLK. (Tr.2 at 6-8, 15, 74). Bolo is trained to alert on odors of marijuana, methamphetamine, Ecstacy, heroin, crack cocaine, and powder cocaine, and in the two and one-half year period he has worked with Officer Phelps, he has been deployed on over six hundred (600) searches. (Tr. at 6-8, 11). Bolo was certified for narcotics detection by the United States Police Canine Association ("USPCA") in March 2007, and was registered with the USPCA prior to the date of the instant vehicle inspection. (Tr.2 at 7, 9, 12-14). As part of the certification and registration process, Bolo competed against other drug detection dogs in regional and national competitions, has never made a mistake or incorrectly failed to alert during prior competitions, and is ranked second in the nation in narcotics detection. (Tr.2 at 9, 13). Bolo continues to train with Officer Phelps, engaging in weekly training sessions, certification and registration processes, and annual drug dog competitions (Tr.2 at 9-13). According to Officer Phelps, Bolo has never made a mistake or had any misses since the dog was assigned to him. (Tr.2 at 10-13).

The keys to the Mercedes CLK were found in Defendant's apartment and a check of the vehicle's tag listed Defendant as the owner. (Tr.2 at 102). Officer Phelps located the silver Mercedes in the apartment complex's parking lot, parked "right behind"

6

Defendant's apartment among other residents' vehicles. (Tr.2 at 15, 21, 24, 103). Officer Phelps walked Bolo around the outside of the Mercedes, at which point Bolo gave two positive alerts for the presence of the odor of narcotics inside the vehicle, specifically, at the trunk and passenger's side. (Tr.2 at 15-16). APD officers thereafter searched the vehicle and recovered two (2) scales commonly used for weighing drugs, a shotgun, and a loaded magazine for a .45 caliber weapon. (Tr.2 at 16-17, 94-95, 97).

Defendant was arrested on October 19, 2007, and APD officers advised Defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (Tr.2 at 56). Defendant indicated that he would be willing to speak with the officers. (Tr.2 at 56). Without posing any further questions to Defendant, APD Investigator Jared Watkins transported Defendant from the scene of his arrest to the Zone 2 police precinct. (Tr.2 at 51-53, 57, 67).

The video and audio recorded interview, conducted by Officer Watkins and ATF Special Agent ("SA") Eric Degree, began at approximately 9:15 p.m. that evening.[3] (Tr.2 at 53-54, 58; see also Gov't Ex. 1). Officer Watkins first asked Defendant to state

_____

[3]Both Officer Watkins and SA Degree were dressed in plain clothes, but identified themselves to Defendant as law enforcement. (Tr.2 at 53). Only Officer Watkins and SA Degree were present in the interrogation room with Defendant; the officers sat at a table and Defendant was seated, handcuffed, across from both officers. (Tr.2 at 55-56). Both doors to the room were closed during the interview. (Tr.2 at 55-56).

7

his age and the highest level of schooling he had completed; Defendant responded that he was twenty-two (22) years old and had completed the eleventh grade. (Tr.2 at 59). Next, Officer Watkins presented Defendant with a <u>Miranda</u> warning form. (Tr.2 at 57). Defendant read the <u>Miranda</u> form aloud, wrote his initials after each warning, stated that he understood each of the listed rights, and signed the waiver at the bottom of the form. (Tr.2 at 58-60). Defendant then inquired whether the officers could provide him with any sort of deal, at which point Officer Watkins and SA Degree explained that they could not provide any deals in exchange for his cooperation. (Tr.2 at 59, 61). Defendant spoke with Officer Watson and SA Degree for some thirty-five (35) minutes thereafter. (Tr.2 at 59-62). According to Officer Watson, Defendant at no point asked for an attorney or requested to stop the interview. (Tr.2 at 61-62). Officer Watson also denied having threatened, made any promises to, yelled at, or physically or verbally intimidated Defendant during the interview. (Tr.2 at 61-62). Moreover, Officer Watson testified that Defendant did not appear to be intoxicated or under the influence of any drugs while responding to questions. (Tr.2 at 61).

> ### C.    <u>The October 22, 2007 Statements</u>

On October 22, 2007, SA Degree interviewed Defendant in an attorney booth at

the Fulton County Jail.[4] (Tr.1 at 14-15). SA Degree conducted the interview as part of the ongoing investigation into Defendant's arrest. (Tr.1 at 14). Defendant was seated without handcuffs on one side of a glass partition throughout the interview, and only SA Degree (seated on the opposite side of the glass partition), Task Force Officer Scott Oliver, and APD Officer Anthony Hall were present. (Tr.1 at 15-16).

SA Degree identified himself to Defendant and recited <u>Miranda</u> warnings to him from memory. (Tr.1 at 14, 16-18). SA Degree testified that Defendant appeared to understand his rights, made no request that SA Degree repeat any of the warnings, and seemed to follow SA Degree's instructions during this process. (Tr.1 at 18). Next, Defendant waived his <u>Miranda</u> rights and agreed to speak with SA Degree. (Tr.1 at 18, 20). SA Degree testified that Defendant seemed calm and alert, and did not appear to perspire unusually or behave strangely. (Tr.1 at 27-28, 31). Moreover, SA Degree stated that Defendant did not appear to be intoxicated or under the influence of narcotics, and nothing about Defendant's behavior, gait, speech, or responses indicated otherwise. (Tr.1 at 18-19). According to SA Degree, Defendant did not request an attorney at any point and never asked to stop the interview. (Tr.1 at 21-22). Lastly, SA Degree denied

---

[4]At the time, SA Degree was aware of Defendant's prior experience with the criminal justice system and that Defendant was in his early twenties. (Transcript of the Motion to Suppress Proceedings ("Tr.1") June 27, 2008, at 20).

AO 72A
(Rev.8/82)

not only that Defendant was ever threatened, made any promises or offers, yelled at, or physically or verbally intimidated, but also that officers ever displayed or threatened Defendant with their weapons. (Tr.1 at 19-20).

On May 13, 2008, a grand jury sitting in the Northern District of Georgia returned a five-count indictment against Defendant alleging violations of federal drug and gun laws, namely, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(B)(I), 846, and 18 U.S.C. § 924(c). Docket Entry [1]. The grand jury returned a seven-count superceding indictment approximately three months later, alleging similar violations. Docket Entry [38]. Defendant now moves to suppress evidence seized and statements made in this case.[5]

## DEFENDANT'S MOTIONS TO SUPPRESS

### A.    The March 9, 2006 Search

Defendant moves to suppress any and all physical evidence seized during the March 9, 2006 search of the Virginia Place apartment for lack of probable cause. In support, Defendant argues that the affidavit on which the search warrant was based (1)

---

[5]Defendant has withdrawn his suppression arguments with respect to those statements he allegedly made to officers on March 9, 2006. Docket Entry [56] at 4-5. In light of this withdrawal, this Court will not address Defendant's arguments, contained in his opening briefs, on this point.

AO 72A
(Rev.8/82)

fails to demonstrate the requisite nexus between the criminal activity alleged and the location to be searched, and (2) is misleading because it states that the APD was dispatched to the apartment on shots fired rather than in response to a stolen vehicle call, omits that the gun used by Defendant had been recovered prior to the warrant's issuance, and suggests, by noting the blood trail outside the apartment, that Defendant was shot inside the apartment. The Government insists that the search warrant at issue is supported by probable cause and denies that the underlying affidavit is in any way misleading. This Court agrees with the Government.

### 1. Validity of the Search Warrant

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures and requires a search warrant to be supported by probable cause. It provides, in pertinent part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. CONST. amend. IV. To establish probable cause, the supporting affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted); see also Illinois v. Gates, 462 U.S. 213, 238 (1983) (probable cause to search a residence exists when "there is a fair probability that contraband or evidence of a crime will be found in

AO 72A
(Rev.8/82)

a particular place"). For example, "the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Martin, 297 F.3d at 1314.

When faced with a challenge to a search warrant on grounds that the underlying affidavit does not establish probable cause to search, a reviewing court must ensure that the judge who issued the warrant had a substantial basis for concluding that probable cause existed. Gates, 462 U.S. at 238. That is, a reviewing court must examine whether, based on the totality of the circumstances presented to the issuing judge, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. The issuing judge's probable cause determination is paid "great deference." Id. at 236; United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999); United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (emphasizing that "[c]ourts reviewing the legitimacy of search warrants should" employ "a realistic and commonsense approach . . . so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations").

This Court finds a substantial basis supports the issuing judge's determination that probable cause existed to search the Virginia Place apartment on March 9, 2006. Officer Anderson's affidavit states that at approximately 11:21 a.m. that morning, APD officers

responded to a "shots fired" call in the area of 2268 Virginia Place. (Affidavit and Order for Search and Seizure, Docket Entry [56-4]). The affidavit explains that Officer Anderson spoke with Defendant at that location, at which point Defendant indicated that shots had been fired at him, he had been shot in his left hand, he retrieved a weapon from the Virginia Place apartment in response, and he then fired the weapon several times at his assailants. (Id.). The affidavit further notes that Officer Anderson observed a trail of blood from outside 2268 Virginia Place leading to the door of the Virginia Place apartment. (Id.). These averments establish a substantial basis for the issuing judge's probable cause finding, specifically, that the Virginia Place apartment could house tangible evidence (handguns, rifles, shell casings, blood, and ammunition) of reckless conduct and discharge of a firearm near a highway, not to mention the requisite nexus between Defendant, the Virginia Place apartment, and his alleged criminal activity. See United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990) ("The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation.").

Moreover, this Court finds nothing misleading in Officer Anderson's averments. First, the Government rightly underlines that the record contains little evidence to link Defendant to any particular weapon prior to the search of the Virginia Place apartment.

13

Defendant notified officers that he had retrieved a weapon from that apartment and fired several shots, Defendant was not armed when he made his initial statements to the officers, and Defendant stated that his brother was armed when he drove off after the assailants. (Tr.2 at 33, 36, 83-84, 87). While officers had recovered a weapon from the vehicle driven by Defendant's brother soon after arriving at the scene and Defendant's brother alleged the weapon belonged to Defendant, (see Tr.2 at 82, 84-85), the record contains no evidence to confirm that Officer Anderson had knowledge of the recovered weapon, that there was only one weapon involved in the admitted shoot-out, or that Defendant's brother's information was reliable. Second, this Court does not view the affidavit's reference to the blood trail as compelling the issuing judge's conclusion that Defendant was shot inside the Virginia Place apartment. On the contrary, Officer Anderson's observation of the blood trail lends credence to Defendant's own description of the incident, which as described above, was summarized in the affidavit. Third, that the affidavit notes the APD was dispatched on shots fired rather than in response to a stolen vehicle call does not suggest misleading on Officer Anderson's part. Although the first responding officer's incident report states she was dispatched on a stolen vehicle call, (see Incident Report, Docket Entry [56-2]), Defendant has adduced no evidence to undermine the stated impetus for Officer Anderson's dispatch to the scene, much less an

14

awareness on Officer Anderson's part that the first responding officer was given a different directive. Without more, Defendant's claims of misleading information are unfounded.

For all these reasons, this Court discerns no basis on which to disturb the issuing judge's finding of probable cause. Gates, 462 U.S. at 236; Miller, 24 F.3d at 1361.

## 2. The Leon Good Faith Exception

Again, Defendant posits that Officer Anderson's affidavit contained misleading information. To the extent Defendant attempts to argue that the allegedly misleading information implicates a recognized limitation on the good faith exception to the exclusionary rule, this Court disagrees.

Under the exclusionary rule, evidence seized as a result of an illegal search is generally inadmissible if offered by the government in a subsequent criminal prosecution against the person from whom government agents seized the evidence. See Franks v. Delaware, 438 U.S. 154, 171 (1978). Nevertheless, the good faith exception to the exclusionary rule set forth in United States v. Leon, 468 U.S. 897 (1984) provides that "courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." Martin, 297 F.3d at 1313. Leon and its progeny have

15

instructed that this good faith exception applies in all but four limited sets of circumstances: (1) where the information in the affidavit was known by the affiant to be false and to have misled the issuing magistrate judge, (2) where the issuing magistrate has wholly abandoned his judicial role, (3) where a warrant is so facially deficient that the executing agent could not have believed it to be valid, and (4) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." See Leon, 468 U.S. at 923; United States v. Taxacher, 902 F.2d 867, 871 (11th Cir. 1990).

This Court finds that the exclusionary rule should not be applied to the evidence seized during the March 9, 2006 search of the Virginia Place apartment. As discussed above, Defendant has presented no credible evidence that the affiant misled the issuing judge in any way, let alone by intentionally phrasing the affidavit to suggest that Defendant had been shot inside his apartment or by failing to note that a weapon had been recovered from Defendant's brother's vehicle prior to the warrant's issuance. Moreover, Defendant makes no claim that any of the remaining three situations enumerated in Leon apply in this case, and this Court detects nothing in the record to warrant their application. This Court therefore concludes that any argument favoring the application of the exclusionary rule to the evidence seized in the March 9, 2006 search

16

must fail.

### B.    The October 19, 2007 Searches

Next, Defendant moves to suppress any and all physical evidence seized during the search precipitated by the bail bondsman and the subsequent warrantless search of his vehicle on October 19, 2007. In particular, Defendant argues his Peachtree Road apartment was illegally searched because the bail bondsman—who he alleges forcibly entered his apartment, enlisted the aid of law enforcement to detain him, moved items from one room to another, and then claimed the items were in plain view—qualifies as a state actor. Next, Defendant contends the affidavit on which the October 19, 2007 search warrant was based contains knowing omissions and/or false and misleading material (*i.e.*, that the contraband was found in plain view) undercutting the finding of probable cause. Defendant also maintains that the <u>Leon</u> good faith exception should not apply because the issuing magistrate was misled by the affidavit's assertion that contraband was found in plain view, and the affidavit itself was so lacking in probable cause such that official belief in its existence was entirely unreasonable. Finally, Defendant asks that any evidence seized from the warrantless search of his vehicle be suppressed as fruit of the poisonous tree, as it was tainted by the unlawful search of the Peachtree Road apartment.

The Government counters that the affidavit underlying the October 19, 2007 search warrant was based on information provided by a bail bondsman acting on his own authority, and as such, suppression is not warranted. Additionally, the Government asserts that even if the Court were to conclude otherwise, all evidence seized is admissible under the Leon good faith exception. The Government also declares that the search of Defendant's vehicle was proper under the automobile exception to the warrant requirement because the vehicle at issue was readily mobile and officers had probable cause to believe the vehicle contained contraband or evidence of a crime.

### 1.    The Bail Bondsman does not Qualify as a State Actor

At common law, the private contractual relationship between a surety and principal excluded bondsmen from the ambit of state action and permitted them to arrest their principals because they were acting pursuant to their private contractual rights. See Taylor v. Taintor, 83 U.S. 366, 371 (1872) (holding that a surety may follow a principal across state lines, arrest a principal on the Sabbath, and break-and-enter into the principal's home to arrest him without process); Fitzpatrick v. Williams, 46 F.2d 40, 42 (5th Cir. 1931) (surety's right over the principal was "an original right that arises from the relationship between the principal and his bail, and not one derived through the State"). Most modern courts hold that bondsmen act under color of State law when they

18

act in concert with police officers, or in some other way attain state authority.  See, e.g., Landry v. A-Able Bonding, Inc., 75 F.3d 200, 204 (5th Cir. 1996) ("[t]he majority of federal courts that have addressed the state action issue in the context of bail bondsmen have based their decisions on whether the bondsmen enlisted the assistance of law enforcement officials in arresting their principals"); Jackson v. Pantazes, 810 F.2d 426, 429-30 (4th Cir. 1987) (finding state action where bondsman obtained aid from a police officer and relationship between bondsmen and State was interdependent); Weaver v. James Bonding Co., 442 F. Supp. 2d 1219, 1226 (S.D. Ala. 2006) (labeling test of whether bail bondsman utilized police assistance in arresting a principal the "litmus test" for finding state action (collecting cases)); McCoy v. Johnson, 176 F.R.D. 676, 681-82 (N.D. Ga. 1997) ("[w]hen bondsmen unilaterally apprehend their principals without any assistance from law enforcement officials, courts have consistently found them not to be state actors" (collecting cases)).  Addressing the bondsmen issue in Jaffe v. Smith, 825 F.2d 304 (11th Cir. 1987), the Eleventh Circuit instructed that whether a bondsman is a state actor depends on the facts and circumstances of each case, and ultimately, held that because the bondmen in question had not received instruction, direction, aid, comfort, or anything else from the government, they were not state actors.  Id. at 307-08.  Implicit in the Jaffe finding "is the conclusion that a professional bondsman is not a state

19

actor when he arrests a principal unless there is some other indicia of state authority or involvement present." McCoy, 176 F.R.D. at 681.

Here, the record contains no evidence that the bail bondsman enlisted the aid of law enforcement officers when he entered the Peachtree Road apartment and subsequently detained Defendant. Although Defendant makes a contrary assertion in his briefing, that assertion is based on nothing more than "information and belief," and is qualified with the pledge that Defendant would submit a supplemental brief on this point. Docket Entry [56] at 10 n.2. Review of the Docket reveals no such supplemental filing from Defendant. See generally Docket. Regardless, the record undercuts even Defendant's unsupplemented assertions. The evidence demonstrates that the bail bondsman, an employee of 24/7 Easy Term Bonds, entered the Peachtree Road apartment, detained Defendant and the other individuals present, observed several handguns and other contraband inside the apartment, and moved the majority of the items from the apartment bedroom to the dining room table. (APD Offense Report, Docket Entry [56-5]). The evidence shows that the bondsman then contacted the APD and recounted the foregoing to officers. (Id.; Report of Investigation, Docket Entry [56-6]). Moreover, the warrant's supporting affidavit makes clear that Officer Baker never entered Defendant's apartment before applying for the warrant; Officer Baker avers that

20

he responded to the bondsman's call, saw Defendant in the bondsman's custody through the apartment's open door, did not enter the apartment, and made the application for a search warrant. (Affidavit and Application for Search Warrant, Docket Entry [56-7]). Thus, there exists no evidence to support Defendant's claim that the bondsman received assistance from law enforcement prior to entering the Peachtree Road apartment. This Court therefore finds that the bondsman was not a state actor when he entered the Peachtree Road apartment and detained Defendant. See Landry, 75 F.3d at 204; Jaffe, 825 F.2d at 307-08; McCoy, 176 F.R.D. at 681-82.

## 2. Validity of the Search Warrant

Defendant also challenges the validity of the October 19, 2007 search warrant, claiming that the underlying affidavit contains knowing omissions and/or misleading material which severely hampered the issuing judge's ability to render an accurate probable cause determination. Defendant takes particular issue with the affidavit's inclusion of statements made by the bondsman to officers, specifically, that all drugs and guns observed in the apartment were in plain view. Defendant's argument lacks merit.

Officer Baker's affidavit details sufficient facts to support the issuing judge's probable cause determination, and in this Court's view, it contains neither omissions nor misleading material to undermine that determination. The affidavit relays that Officer

21

Baker responded to the bondsman's call regarding drugs and guns at the Peachtree Road apartment. (Affidavit and Application for a Search Warrant, Docket Entry [56-7]). The affidavit states that the bondsman, who worked for 24/7 Easy Term Bonds, informed Officer Baker that he had been sent to the apartment to apprehend Defendant and that while inside, he observed weapons and suspected heroin in plain view. (Id.). The affidavit then makes clear that Officer Baker, once at the scene, observed Defendant handcuffed and in the bondsman's custody from the open, outside door of the apartment. (Id.). Officer Baker expressly avers that he did not enter the apartment before submitting his search warrant application. (Id.). Furthermore, as explained above, the bondsman was not a state actor when he unilaterally entered the apartment, apprehended Defendant, searched the apartment, and then contacted law enforcement regarding his discovery of contraband. See Landry, 75 F.3d at 204; Jaffe, 825 F.2d at 307-08; McCoy, 176 F.R.D. at 681-82. That the bondsman told Officer Baker that the contraband was "in plain view" is of no consequence; the bondsman's conduct was not unlawful and is certainly not attributable to government authorities. In short, the inclusion of the bondsman's plain view reference does little to undercut the issuing judge's finding of probable cause, and based on the totality of the circumstances, that finding is well supported. Gates, 462 U.S. at 238.

22

### 3.    <u>The Leon Good Faith Exception</u>

Defendant's next claim is that the <u>Leon</u> good faith exception cannot salvage the October 19, 2007 warrant because (1) the issuing magistrate was misled by the affidavit's assertion that the contraband was found in plain view, and (2) the supporting affidavit was so lacking in probable cause such that official belief in its existence was entirely unreasonable.

Neither cited limitation on the <u>Leon</u> good faith exception is applicable here. First, Defendant has not shown that the information in the affidavit was known by Officer Baker to be false or to have misled the issuing judge. The affidavit states only that the bondsman observed the contraband in plain view, not that Officer Baker did so prior to submitting his search warrant application. (Affidavit and Application for a Search Warrant, Docket Entry [56-7]). Moreover, none of the discovery documents Defendant submits, which note that the bondsman informed officers he discovered contraband in plain view but moved the majority to the apartment's dining room table, suggest a knowing omission or misleading statement on Officer Baker's behalf with respect to the bondsman's discovery of the contraband. (<u>See</u> APD Offense Report, Docket Entry [56-5] (per bondsman, drugs recovered from bedroom at foot of bed in a clear plastic box, Rossi .38 caliber revolver recovered from small table under bedroom window,

Springfield Armory .45 caliber handgun recovered from TV stand in bedroom, AK-47 type rifle recovered from bed close to wall, Taurus .38 caliber revolver on dining table, bag of marijuana recovered from coffee table, and then all moved by bondsman to dining table); APD Report of Investigation, Docket Entry [56-6] ("APD advised that [bondsman], while making the fugitive recovery, noticed several handguns and a large amount of suspected heroin inside the apartment. [The bondsman] advised APD that he moved a majority of the contraband and firearm related items to a dinning [sic] table.")). Second, as explained in detail above, Officer Baker's affidavit is not so lacking in indicia of probable cause so as to render official reliance on it entirely unreasonable. Defendant's argument to the contrary—which is wholly based on the premise that the information included in the affidavit was obtained as a result of unlawful conduct by the bondsman—is unavailing. See Taylor, 83 U.S. at 370 (describing the broad powers conferred on bondsman under common law). Accordingly, this Court finds that the exclusionary rule should not be applied to the evidence seized by law enforcement during the October 19, 2007 search of the Peachtree Road apartment.

### 4. The Search of Defendant's Vehicle

Defendant's final challenge to the seizure of tangible evidence relates to the warrantless search of his vehicle on October 19, 2007. Defendant declares that

24

suppression is required because the search of his Peachtree Road apartment was unlawful and that unlawful search tainted the subsequent vehicle search. The Government insists that the vehicle was lawfully searched pursuant to the automobile exception to the warrant requirement.

The automobile exception permits warrantless vehicle searches if the vehicle in question is readily mobile and agents have probable cause to believe the vehicle contains evidence of a crime. Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). No special exigency is required beyond a showing of the vehicle's mobility, see Dyson, 527 U.S. at 467, but factors relevant to this initial determination include the vehicle's location, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road. California v. Carney, 471 U.S. 386, 394 n.3 (1985). Probable cause, in turn, is determined under the facts of each case, and exists when under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found" in the vehicle. United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002).

This Court determines that Defendant's vehicle was lawfully searched pursuant to the automobile exception. First, as the Government correctly notes, all evidence

suggests that Defendant's vehicle was readily mobile. The vehicle was parked right behind Defendant's apartment among other residents' vehicles in the apartment complex's parking lot, which itself was located off Peachtree Road. (Tr.2 at 102-04). Additionally, officers recovered keys to the vehicle in Defendant's Peachtree Road apartment, and a check of the vehicle's tag revealed Defendant as the vehicle owner. (Tr.2 at 102). Second, officers had probable cause to search the vehicle after Bolo, a trained and certified narcotics detection dog with a pristine detection record (see Tr.2 at 6-9, 11-14), gave two positive alerts to the presence of the odor of narcotics while circling the vehicle with his handler. (Tr.2 at 15-16). Specifically, Bolo sniffed the vehicle and alerted officers to the odor of narcotics near the trunk and on the passenger's side of Defendant's vehicle. (Tr.2 at 15-16). The Eleventh Circuit has long recognized that "probable cause arises when a drug-trained canine alerts to drugs." United States v. Tamari, 454 F.3d 1259, 1265 (11th Cir. 2006) (citing United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993); United States v. Dunkley, 911 F.2d 522, 527 (11th Cir. 1990); United States v. Puglisi, 723 F.2d 779, 783 (11th Cir. 1984)). Bolo's positive alert therefore "was itself sufficient to give [officers] probable cause to search the [vehicle]." Tamari, 454 F.3d at 1265. Having thus found that Defendant's vehicle was readily mobile and probable cause existed, this Court concludes that the officers were entitled

26

to search Defendant's vehicle under the automobile exception to the warrant requirement.

### C. The October 19, 2007 and October 22, 2007 Statements

Lastly, Defendant contends that the statements he made to law enforcement officers on October 19, 2007 and October 22, 2007 must be suppressed because the record is not clear that he was fully coherent, understood his right against self-incrimination, and recognized his right to have an attorney present when questioned. Defendant also maintains that any statements he made on these dates must be suppressed as the fruit of the bondsman's unlawful search.[6] The Government responds that the evidence establishes Defendant was read and understood his rights, and willfully and voluntarily spoke with law enforcement on both occasions.

<u>Miranda</u> "'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'" <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting <u>Endress v. Dugger</u>, 880 F.2d 1244, 1248 (11th Cir. 1989)). A defendant is in custody for <u>Miranda</u> purposes when there has been a "formal arrest or restraint on freedom of movement of the degree

---

[6]To the extent that Plaintiff reiterates this argument here, it is unavailing for the reasons previously articulated.

27

associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (quotation marks omitted); <u>see also</u> <u>United States v. McDowell</u>, 250 F.3d 1354, 1362 (11th Cir. 2001). The threshold inquiry, therefore, is whether a defendant was informed of his <u>Miranda</u> rights. <u>United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995).

In this case, Officer Watkins testified that he first advised Defendant of his <u>Miranda</u> rights outside the Peachtree Road apartment on October 19, 2007. (Tr.2 at 56). Officer Watkins explained that Defendant professed his willingness to speak with the officers, and as such, he was transported from the scene of his arrest to the police precinct without questioning. (Tr.2 at 51-53, 57, 67). Next, Officer Watkins testified that he presented a <u>Miranda</u> warning form to Defendant while at the precinct, and that Defendant read the form aloud, wrote his initials after each listed right, stated that he understood each of the rights as listed, and signed the waiver contained on the form. (Tr.2 at 58-60; Gov't Exs. 1-2). The record contains no evidence to suggest that Defendant had any questions regarding the rights as presented to him, and Officer Watson confirmed that Defendant neither voiced a desire to speak to an attorney nor asked to stop the interview. (Tr.2 at 61-62). Likewise, SA Degree testified that he recited all <u>Miranda</u> warnings to Defendant at the outset of the October 22, 2007 interview. (Tr.1 at 14, 16-18). SA Degree stated that Defendant appeared to understand

28

his rights, made no request that SA Degree repeat any of the warnings, and seemed to follow SA Degree's instructions during this entire process. (Tr.1 at 18). SA Degree then testified that Defendant waived his <u>Miranda</u> rights and agreed to speak with him, and at no point requested to speak with an attorney or to stop the interview. (Tr.1 at 18, 20-22). This Court perceives nothing in the record to discredit either officers' testimony, and despite Defendant's claims to the contrary, nothing in the record indicates that he was not fully coherent or did not understand his rights. As such, this Court finds that on October 19, 2007 and October 22, 2007, respectively, Defendant was effectively advised of his <u>Miranda</u> rights and understood those rights as presented to him.

Having found that Defendant was advised of his <u>Miranda</u> rights, this Court must next determine whether he voluntarily, knowingly, and intelligently waived those rights. <u>Barbour</u>, 70 F.3d at 585; <u>see also</u> <u>Hart v. Florida</u>, 323 F.3d 884, 891 (11th Cir. 2003). This involves a two-part inquiry: (1) the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced

AO 72A
(Rev.8/82)

choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. Consideration of the totality of the circumstances necessarily requires an assessment of "both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). No single factor is necessarily determinative of the issue, but courts typically consider the accused's intelligence, education, age, drug and alcohol use, psychological problems, and prior experience with the criminal justice system, as well as the length of the detention, the nature of the interrogation, the application of physical force or the threat thereof, and the use of a promise or an inducement by police. Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) (citing United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)).

Considering the totality of the circumstances surrounding Defendant's multiple statements to law enforcement—at the scene of his arrest and during the October 19, 2007 and October 22, 2007 interviews—this Court finds that Defendant's waiver of his Miranda rights and post-arrest statements were voluntary. Again, Officer Watkins stated that Defendant communicated his willingness to speak with officers before he was escorted to the police precinct for questioning on October 19, 2007. (Tr.2 at 51-53, 57, 67). Defendant answered questions posed by Officer Watkins and SA Degree for a total

30

of thirty-five minutes, while seated, handcuffed, opposite both officers. (Tr.2 at 55-56, 59-62). Officer Watkins testified that Defendant did not appear to be intoxicated or under the influence of any substance while responding to questions. (Tr.2 at 61). Moreover, Officer Watkins denied having made any threats to Defendant or having promised Defendant anything in exchange for his statements, and no physical or verbal intimidation took place. (Tr.2 at 61-62). Similarly, SA Degree testified that Defendant agreed to speak with him on October 22, 2007. (Tr.1 at 18, 20). Having been present during Defendant's interview three days earlier, SA Degree was aware of Defendant's age, education, and prior experience with the criminal justice system. (Tr.1 at 20). According to SA Degree, Defendant seemed calm and alert, exhibited no strange behavior, and did not appear to perspire profusely during the interview. (Tr.1 at 27-28, 31). Like Officer Watson, SA Degree testified that Defendant did not appear to be intoxicated or under the influence of drugs, and nothing about Defendant's conduct, gait, speech, or responses indicated otherwise. (Tr.1 at 18-19). SA Degree also confirmed that Defendant was never threatened, made any promises, yelled at, or physically or verbally intimidated, and no weapons were displayed to Defendant. (Tr.1 at 19-20). Accordingly, this Court finds that, under the totality of the circumstances, officers did not obtain Defendant's October 19, 2007 and October 22, 2007 statements in violation

AO 72A
(Rev.8/82)

of <u>Miranda</u> or the Constitution.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court **RECOMMENDS** that Defendant's Motion to Suppress Illegally Seized Evidence, Motion to Suppress Statements, and Perfected Motion to Suppress Evidence be **DENIED**. Docket Entries [11, 14, 26]. Defendant's Unopposed Motion for Extension of Time in which to File Responsive Brief is **GRANTED NUNC PRO TUNC** to November 4, 2008. Docket Entry [55].

There are no further motions or problems pending before the undersigned to prevent the scheduling of Defendant for trial. As such, Defendant is hereby **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED** this <u>15th</u> day of December, 2008.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,          )
                                   )
    Plaintiff,                     )          Criminal Action No.
                                   )          1:08-CR-00187-CAP-LTW
v.                                 )
                                   )
JOSEPH MANN PROPST,                )
                                   )
    Defendant.                     )

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge
made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule
72.1C.  Let the same be filed and a copy, together with a copy of this Order, be served
upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b) (1), within ten (10) days after service of this order,
each party may file written objections, if any, to the Report and Recommendation.
Pursuant to Title 18, United States Code, Section 3161(h) (1) (F), **the above-referenced
ten (10) days allowed for objections is EXCLUDED from the computation of time
under the Speedy Trial Act.**

Should objections be filed, they shall specify with particularity the alleged error
or errors made (including reference by page number to the transcript if applicable) and

shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court.  If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review.  United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 15th day of December, 2008.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE